**Raymond Ludwig FROST,**
**Plaintiff–Appellant,**

v.

**J. Fife SYMINGTON, Governor; Samuel A. Lewis, Director; Larry Barrows, Asst. Deputy Warden; Charles L. Ryan, Senior Warden; James Upchurch, Warden; Angelo P. Daniels, Deputy Warden; Paul Schriner, Depu-**

ty Warden; Marvin E. Jump, CPO aka Marvin E. Tump; M. Sturm, # 688; Sgt. Allen; Sgt. Duran, Defendants–Appellees.

No. 98–15578.

United States Court of Appeals,
Ninth Circuit.

Submitted June 18, 1999*

Decided Nov. 23, 1999

* This panel unanimously agrees that this case is appropriate for submission without oral argument pursuant to Fed. R.App. P. 34(a)(2).

Raymond Ludwig Frost, Florence, Arizona, in pro se for the plaintiff-appellant.

S. Christopher Copple, Assistant Attorney General, Phoenix, Arizona, for the defendants-appellees.

Before: Schroeder, Fletcher, and Hall, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Raymond Ludwig Frost ("Frost") appeals from the district court's order granting the Defendants' motion for summary judgment in Frost's action under 42 U.S.C. § 1983 for violations of his First and Fourteenth Amendment rights and the *Hook* Consent Decree. Frost seeks damages from Arizona Department of Corrections ("ADOC") officials who allegedly withheld issues of *Penthouse* and *Gallery* magazines and returned without authorization music CDs Frost ordered from BMG Music Service ("BMG"). We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.

## I.

In October 1973, the district court approved a consent decree in *Hook v. Arizona*, No. CIV–73–97 PHX–CAM (the "*Hook* Consent Decree"), a suit brought by eleven inmates of the ADOC over mail regulations. Under the *Hook* Consent Decree, inmates could not receive publications[1] that were found to contain (1) "material which constitutes a direct and immediate threat to the security, safety or order of the institution," or (2) "any material which is deemed obscene under applicable constitutional standards." The *Hook* Consent Decree also provided that

"[p]rompt written notice will be given a resident if any publications are excluded for the above reasons. Upon request, the resident will be given an opportunity to discuss the reasons for the exclusion with the Deputy Superintendent for Programs, whose decision shall be final." Although *Hook* was not initially certified as a class action,[2] the Ninth Circuit held that inmates of the ADOC who were not parties to the *Hook* Consent Decree were entitled to enforce the provisions of the *Hook* Consent Decree as intended third-party beneficiaries. *See Hook v. Arizona Dep't of Corrections*, 972 F.2d 1012, 1014–15 (9th Cir.1992).

Frost has been an inmate at the ADOC since 1989, and was not a party to the *Hook* Consent Decree. During the time of his confinement, Frost has subscribed to *Gallery* and *Penthouse* magazines, both of which are pornographic publications. In addition, Frost has been a member of BMG, through which he has ordered various music CDs.

In late January 1994, J. Fife Symington ("Symington"), the Governor of Arizona, said in a public speech that he planned to get tough with inmates at the ADOC. On January 31, 1994, Samuel Lewis ("Lewis"), Director of the ADOC, announced in a memorandum that all sex-based publications were to be banned from the ADOC as of February 27, 1994.[3] On February 24, 1994, Lewis withdrew the directive, and the ban did not officially go into effect. Frost claims that Lewis nevertheless issued clandestine orders to Senior Warden Charles L. Ryan ("Ryan"), Warden James Upchurch ("Upchurch"), Warden James

---

1. The *Hook* Consent Decree defined "publication" as "[r]eproduced written and/or pictorial matter released for public use including books, periodicals, newspapers, pamphlets, photographs, etc."

2. It appears, however, that in August 1994 a class may have been certified with respect to a limited issue. *See Hook v. Arizona*, 907 F.Supp. 1326, 1332 (D.Ariz.1995). Unfortunately, the August 1994 order granting in part

the motion for class certification is not part of the record in this case.

3. Although Frost claims that Symington directed Lewis to issue this memorandum, Lewis testified in a prior proceeding that he had acted alone in circulating the memorandum, and that Symington did not direct him to issue the memorandum. *See Hook v. Arizona*, 907 F.Supp. 1326, 1331 (D.Ariz.1995).

Thomas,[4] and Deputy Warden Angelo P. Daniels ("Daniels") to withhold from inmates any sex-based publications without notifying the inmates that the publications were being withheld, and to dispose of the publications. Frost claims that no pornographic magazines were allowed into the ADOC during February and March, 1994.

Frost claims that, pursuant to the Lewis directive, the ADOC withheld four magazines he had ordered: the January 1994 and February 1994 issues of *Gallery* and *Penthouse*. He claims that he did not receive notice that these magazines were being withheld, and that he was not told why these issues had been withheld. It appears, however, that Frost received both issues of *Gallery* after contacting the publisher and having the issues redelivered. It also appears that Frost's subscription to *Penthouse* was extended by two months to reflect the issues that were withheld, but Frost never apparently received the two withheld issues of *Penthouse*. On September 5, 1995, the ADOC received the October 1995 issue of *Penthouse*. An unidentified mailroom officer rejected this issue for "showing penetration," "material which, in the Warden's opinion, pose[d] a threat to the safe, secure and orderly operation of the prison." On September 14, 1995, Frost appealed the rejection of the October 1995 issue by writing an inmate letter to the Deputy Superintendent of Programs pursuant to the *Hook* Consent Decree. Two weeks later, Deputy Warden David Bourgeous[5] interviewed Frost, and explained to Frost that the issue was one of "penetration and not threat to security!"

On October 3, 1995, the November 1995 issue of *Penthouse* was received by the prison mailroom. An unidentified mailroom officer rejected this issue because it was "Unauthorized Property: Items not inherently illegal which are considered contraband when possessed by an inmate." On October 5, 1995, Daniels reviewed this issue of *Penthouse* and noted, "Photos show penetration. Advertisements solicit sexual behavior that poses a threat to female staff working in this institution." Then on January 2, 1996, approximately three months after the ADOC received this issue of *Penthouse*, Frost received a notice indicating that this issue had been rejected by the ADOC.

On December 29, 1995, Frost claims that he received four magazines: the December 1995 and January 1996 issues of *Gallery* and *Penthouse*. Frost had not received notice that these magazines were being stored.

On February 6, 1996, the March 1996 issue of *Penthouse* was received by the mailroom. On March 14, 1996 the mailroom received the April 1996 issue of Penthouse. On both occasions an unidentified mailroom officer rejected the issues because they "contain[ed] material which, in the Warden's opinion, pose[s] a threat to the safe, secure and orderly operation of the prison." In addition, on separate forms, Deputy Warden Murphy rejected the issues because they showed "vaginal penetration," and "anal penetration," respectively. It is unclear whether Frost received notice that the March 1996 issue of *Penthouse* had been rejected by the ADOC. On April 3, 1996, Frost received notice that the April 1996 issue had been rejected by the ADOC.

On April 1, 1996, and again on April 30, 1996, the mailroom received the May 1996 issue of *Penthouse*. On both dates, an unidentified mailroom officer rejected the issues because they "contain[ed] material which, in the Warden's opinion, pose[s] a threat to the safe, secure and orderly operation of the prison." The record does not show, however, that this issue was re-

4. Thomas is not named as a defendant in Frost's complaint.

5. In his complaint, Frost states that he was interviewed by "Defendant Barrows." However, Frost's identification of his interviewer appears to be incorrect because Bourgeous' name appears on the Inmate Letter with the written explanation for the rejection of the magazine.

viewed by a deputy warden, nor does it contain the reasons why this issue was rejected. On April 11, 1996, and on May 14, 1996, Frost received notice that this issue had been rejected by the ADOC.

As of August 14, 1996, Frost had not received the June 1996, July 1996, August 1996, and September 1996 issues of *Penthouse*, nor had Frost received notice that any of these issues had been rejected by the ADOC. However, Frost was informed by *Penthouse* that these issues had been sent.

In 1991, Frost became a member of BMG, through which he purchased music CDs that were delivered to the prison and distributed to Frost between July, 1991, and July, 1992. In December, 1992, and again in January, 1993, Frost received from BMG notices indicating that CDs that had been sent to Frost had been returned to BMG. ADOC officials explained to Frost that the CDs had never been received by the ADOC. In February 1993, Frost canceled his BMG membership. In April 1995, Frost received a letter from BMG inviting him once again to become a member of BMG. Under the terms of the letter, Frost was invited to choose eight free CDs for which he would be obligated to pay a per-item shipping and handling fee. In return for the eight free CDs, Frost would be obligated to purchase at full price one CD through BMG any time within the next year. In June 1995, Frost accepted the offer, and BMG mailed to Frost the eight CDs that he had chosen. Shortly thereafter, BMG determined that Frost was institutionalized and requested that ADOC officials return the CDs to BMG. The record indicates that BMG's policy at the time prohibited residents of institutions from becoming BMG members. The ADOC officials concluded that the CDs were still BMG's property because Frost had not paid for

them, and returned the CDs to BMG. Frost alleges that ADOC officials never informed him that the CDs had been returned to BMG.

Frost filed suit under 42 U.S.C. §§ 1983 and 1985 for violations of the *Hook* Consent Decree and his First and Fourteenth Amendment rights. Frost sought compensatory damages in the amount of $1000 "for each magazine withheld, delayed, or stored in violation of *Hook*. To date in the amount of $12,000." Frost also sought compensatory damages in the amount of $1408 for the unauthorized return of his CDs. In addition, Frost sought punitive damages in the amount of $10,000 for the ADOC's "continued unlawful planned scheme to knowingly and deliberate[ly] violation of [sic] this Court's Orders and the *Hook* Consent Decree, as well as the pattern of coverup of Defendants['] actions." Finally, Frost sought "other relief as may be just and proper." In his motion for summary judgment, Frost requested (pursuant to the prayer in his complaint for "other relief") that the court hold the Defendants in contempt for their violations of the *Hook* Consent Decree. Frost named as defendants Symington, Lewis, Barrows, Ryan, Upchurch,[6] Daniels, Schriner, Jump, Sturm, Allen, and Duran.

■ Construing the claims liberally, as must be done because of Frost's pro se prisoner status, *see Franklin v. Murphy*, 745 F.2d 1221, 1235 (9th Cir.1984) (holding that a pro se prisoner litigant's pleadings must be construed liberally on a motion for summary judgment); *see also Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir.1988) ("In civil rights cases where the plaintiff appears pro se, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt."), it appears that Frost asserted the following claims based on the following conduct: (1) violation of the *Hook* Consent Decree for failure to

---

**6.** Upchurch ended his job as Warden on October 10, 1995, before most of the actions alleged in Frost's complaint took place.

notify Frost that magazines had been rejected, late delivery of notices rejecting magazines, late delivery of magazines, improper withholding of magazines, unauthorized return of music CDs, and failure to notify Frost that music CDs were to be returned; (2) violation of Frost's First Amendment rights for withholding issues of *Penthouse* and for returning his music CDs; (3) violation of Frost's Fourteenth Amendment due process rights (property and liberty interests) for failure to notify Frost that his magazines had been rejected, and for returning without notice Frost's music CDs. In response, the Defendants asserted a qualified immunity defense as to the withholding of the magazines. Both Frost and the Defendants filed motions for summary judgment.

Analyzing the cross motions for summary judgment, the district court determined that Frost's claim was basically one seeking enforcement of the *Hook* Consent Decree, and that Frost was therefore required to proceed through *Hook* class counsel. However, the court also decided that Frost could proceed outside of the *Hook* class action to the extent that he was seeking damages, as opposed to equitable relief. To that end, the court characterized Frost's claim as one alleging violations of his First Amendment rights instead of one alleging breach of the *Hook* Consent Decree. The court then addressed separately the ADOC's conduct with respect to the CDs and the magazines. The district court rejected Frost's claim with respect to the CDs because the court decided that the CDs had been returned to BMG at the request of BMG, and that BMG was entitled to the return of the discs because Frost had not paid for them. Admitting that the ADOC's confiscation of Frost's magazines raised First Amendment concerns, the district court applied the *Turner* reasonableness test to the ADOC's policy to reject publications "that dictate sexual penetration." The district court decided that Frost's First Amendment rights had not been violated, and that the Defendants were entitled to qualified immunity. The district court then granted the Defendants' motion for summary judgment, and denied Frost's motion for summary judgment. Frost timely appealed the district court's order.

## II.

We review de novo the district court's order granting the Defendants' motion for summary judgment to determine whether there are any genuine issues of material fact and whether the district court properly applied the relevant substantive law. *See Margolis v. Ryan,* 140 F.3d 850, 852 (9th Cir.1998). In reviewing the district court's order, the panel views the evidence in the light most favorable to Frost. *See id.*

## III.

Frost contends that the district court improperly granted summary judgment on his claims that the Defendants violated his Fourteenth Amendment due process rights by withholding magazines without notice, delivering notices of withholding after unreasonable delays, and storing the magazines for unreasonable amounts of time before delivering them to him. The district court did not consider whether the Defendants had violated Frost's Fourteenth Amendment rights, and instead considered only whether the Defendants had violated his First Amendment rights.

Frost has a Fourteenth Amendment due process liberty interest in receiving notice that his incoming mail is being withheld by prison authorities. *See Miniken v. Walter,* 978 F.Supp. 1356, 1363–64 (E.D.Wash.1997) (holding that prison officials' failure to notify an inmate that his incoming non-junk mail was being withheld violated the inmate's Fourteenth Amendment Rights); *see also Thornburgh v. Abbott,* 490 U.S. 401, 406, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (upholding a prison's restrictions on inmates receiving publications detrimental to prison security where

the prison regulations required the warden to promptly notify an inmate that his mail was being withheld); *Hook* Consent Decree (requiring "[p]rompt written notice" when publications withheld); ADOC Internal Management Policy No. 302.4 § 6.9.6 (requiring notice "within 24 hours after seizure of items"). The district court therefore erred by not considering Frost's Fourteenth Amendment claims, which were supported by unrebutted evidence that (1) Frost did not receive the February or March 1994 issues of *Penthouse* and *Gallery,* the June, July, August, or September 1996 issues of *Penthouse,* and was not notified that these magazines were being withheld; (2) Frost received notice that the November 1995 issue of *Penthouse* was being withheld three months after the ADOC had received the magazine; (3) Frost received the December 1995 issues of *Gallery* and *Penthouse* almost two months after the ADOC had received these magazines; and (4) Frost received the January 1996 issues of *Gallery* and *Penthouse* approximately three weeks after the ADOC had received these magazines. On remand, the district court should consider whether the Defendants' actions satisfied the minimum procedural safeguards required by the Due Process Clause.[7]

## IV.

Frost next contends that, with respect to the sexually explicit magazines, the district court erred by granting the Defendants' motion for summary judgment on alternate grounds: (1) that the Defendants did not violate his First Amendment rights by withholding issues of *Gallery* and *Penthouse* magazines, and (2) that the Defendants were entitled to qualified immunity for their actions.

Frost's First Amendment claim prompts us to reconcile our recent en banc opinion in *Mauro v. Arpaio,* 188 F.3d 1054 (9th

Cir.1999) with our earlier decision in *Walker v. Sumner,* 917 F.2d 382 (9th Cir.1990) relating to the evidentiary burden that prison officials must meet in order to satisfy the first prong of the Supreme Court's *Turner* test.

Under *Turner v. Safley,* a regulation that impinges upon a prisoner's constitutional rights is valid if the regulation "is reasonably related to legitimate penological interests." 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The *Turner* Court articulated a four-pronged test that guides courts in determining whether a challenged regulation passes constitutional muster. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (quoting *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Specifically, the "logical connection between the regulation and the asserted goal" must not be "so remote as to render the policy arbitrary or irrational," and the governmental objective must be both "legitimate and neutral." *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254. Second, it is relevant "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90, 107 S.Ct. 2254. Third, courts are to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Fourth, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.*

Handed down just a few years after *Turner, Walker v. Sumner* was one of our earlier efforts to give greater content to the *Turner* test. *Walker* involved a civil rights action brought by a prison inmate who alleged that prison officials had forcibly taken a blood sample from him without his consent and had threatened to shoot

7. Furthermore, Frost alleges that ADOC officials never notified him that his CDs had been returned to BMG. Frost has the same due process interest in receiving notice of ADOC's actions regardless of whether the item being withheld or returned is a magazine or a CD.

him with a taser gun unless he agreed to provide a sample. In their pleadings, the prison officials alleged that the "blood tests were in fact administered in order to determine if any prisoners were carriers of the AIDS virus." *Walker*, 917 F.2d at 384. But Walker argued that the real purpose behind the tests was to train medical personnel in the administration of AIDS tests. The court noted that if that was indeed the purpose of the tests, Walker "may well be correct" that the policy did not further "a legitimate penological objective." *Id.* at 387. In parsing the various competing explanations, the *Walker* court held that:

> Prison authorities cannot rely on general or conclusory assertions to support their policies. Rather, they must first identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests. An evidentiary showing is required as to each point.

*Id.* at 386. Thus, the court brushed aside the government's stated justification for the policy—preserving the health, safety, and welfare of the inmates—in the absence of any evidence that the policy actually was implemented to further this objective.

Without citing *Walker*, *Mauro* appears to have implicitly called its underpinnings into question. In very clear and broad language, *Mauro* dramatically diminishes the level of scrutiny that courts ordinarily are to apply to the decisions of prison administrators:

> To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned material actually caused problems in the past, or that the materials are "likely" to cause problems in the future. *See Thornburgh*, 490 U.S. at 417, 109 S.Ct. 1874; *Casey*, 4 F.3d at 1521. Moreover, it "does not matter whether we agree with" the defendants or whether the policy "in fact advances"

the jail's legitimate interests. *See Amatel*, 156 F.3d at 199. *The only question that we must answer is whether the defendants' judgment was "rational," that is, whether the defendants might reasonably have thought that the policy would advance its interests. See id.*

*Mauro*, 188 F.3d at 1060 (emphasis added). This language holds that even in the absence of institution-specific or general social science evidence, as long as it is plausible that prison officials believed the policy would further a legitimate objective, the governmental defendant should prevail on *Turner*'s first prong.

Indeed, it was the lack of a trial record that could have shed light on the prison's *actual* (as opposed to *possible*) motivations for the policy that sparked a strong dissent by Judge Kleinfeld. *See id.* at 1066, 1068 (Kleinfeld, J., dissenting). Thus, whereas the *Walker* court found fatal the defendant's failure to offer evidence concerning its actual motivation for implementing the regulation at issue, the *Mauro* court did not inquire into the prison's actual motivation, and ruled that as a matter of law the prison's purported motivations were legitimate and rationally furthered by the prison's ban on sexually explicit materials. *See id.* at 1060.

*Mauro*'s favorable citations to *Amatel* are also quite relevant. In *Amatel v. Reno*, 156 F.3d 192 (D.C.Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 2392, 144 L.Ed.2d 793 (1999), the D.C. Circuit reversed a district judge's ruling that a ban on the use of prison funds to purchase sexually explicit materials for inmates violated the prisoners' First Amendment rights. In that instance, the circuit court was deferring to a legislative judgment about the relationship between sexually explicit materials and prison security. In a critical passage, the Court noted that even though there was *no evidence in the record* supporting a connection between the ban and prison security, that did not render the legislative judgment irrational:

There is, of course, no "record evidence," and certainly no sophisticated multiple regression analyses or other social science data, to support this belief— a fact our dissenting colleague finds fatal. We do not think, however, that common sense must be the mere handmaiden of social science data or expert testimonials in evaluating congressional judgments. Quite the opposite: scientific studies can have a corrective effect by establishing an apparently implausible connection or refuting an apparently obvious one, but, subject to such corrections, conformity to commonsensical intuitive judgments is a standard element of both reasonableness and rationality.... Here, the regulations restrict prison consumption of publications that implicitly elevate the value of the viewer's immediate sexual gratification over the values of respect and consideration for others. Common sense tells us that prisoners are more likely to develop the now-missing self-control and respect for others if prevented from poring over pictures that are themselves degrading and disrespectful.

*Id.* at 199 (citations omitted). The opinion then discusses the evidence that exposure to sexually explicit materials makes inmates more likely to commit sex crimes after release, more aggressive, more tolerant of violence against women, and more susceptible to myths about rape. *Id.* at 200. While admitting that there is an impressive quantum of evidence taking issue with these studies, the court concluded that this scientific uncertainty unquestionably placed the "legislative judgment within the realm of reason under the standards applicable to the political branches' management of prisons." *Id.*

A careful reading of the passage excerpted *supra* helps shed light on the apparent tension between *Mauro* and *Walker*. The D.C. Circuit noted that the government could use scientific studies or record evidence to establish a rational connection between a policy and objective that do not appear intuitively connected. *Id.* at 199. If it failed to do so, the inmate would prevail on *Turner*'s first prong. Conversely, an inmate could marshal scientific studies or record evidence to "refute an apparently obvious" connection between a prison policy and a legitimate objective. *Id.* If he failed to do so, the government would prevail on prong one.

In *Walker*, the plaintiff presented evidence, *and the government did not contest,* that "the prison officials knew that no prisoners had AIDS at the time the disputed samples were taken." *Walker*, 917 F.2d at 384. This evidence sufficed to refute the otherwise obvious connection between taking blood samples from prisoners and preserving the health, welfare, and safety of prisoners by diagnosing those who were HIV positive. If prison officials knew that no prisoner was HIV positive but nevertheless tested all prisoners for the AIDS virus, then an interest in inmates' health, welfare, or safety cannot have rationally motivated the policy.

In *Mauro*, on the other hand, the plaintiffs presented no evidence casting doubt on the obvious connection "between the possession of sexually explicit materials and the problems sought to be addressed by the policy—sexual harassment of female officers, jail security and rehabilitation of inmates...." 188 F.3d at 1060. Indeed, the panel explicitly held that because the parties did not raise the "issue of material fact regarding whether the jail's policy of excluding sexually explicit materials was imposed for the purpose of punishing pretrial detainees[,]" the argument was deemed waived. *Id.* at 1059 n. 2. Thus, unlike in *Walker*, *Mauro* did not satisfy his burden of refuting an intuitive, common sense connection between the state's policy and its objectives.

█ This analysis helps demonstrate that *Walker* and *Mauro* do not conflict;[8]

---

**8.** The *Mauro* court implicitly rejected the suggestion that its ruling directly conflicted with

they merely apply in different situations. When the inmate presents sufficient (pre or post) trial evidence that refutes a common-sense connection between a legitimate objective and a prison regulation, *Walker* applies, and the state must present enough counter-evidence to show that the connection is not so "remote as to render the policy arbitrary or irrational." *Mauro,* 188 F.3d at 1060 (quoting *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254, and *Amatel,* 156 F.3d at 200–01). On the other hand, when the inmate does not present enough evidence to refute a common-sense connection between a prison regulation and the objective that government's counsel argues the policy was designed to further, *Mauro* applies and, presuming the governmental objective is legitimate and neutral, *see Thornburgh,* 490 U.S. at 414, 109 S.Ct. 1874, *Turner*'s first prong is satisfied.

■ In this instance Arizona's government has put forward three justifications for the challenged regulations: (1) They are necessary "to insure the safety of inmates and prison officers"; (2) they "protect female officers from abuse and harassment"; and (3) the publications depicting sexual penetration "are likely to cause inmates who come in contact with the material to harass and/or abuse other individuals". *Appellees' Brief* at 16. These objectives and their connection to a ban on possession of materials depicting sexual penetration clearly pass the "common sense" standard of *Mauro* and *Amatel.*[9] Because, at the summary judgment stage, the inmate presented insufficient evidence to refute this common-sense connection, the government was not required to make any evidentiary showing concerning the connection. Since the same analysis holding the *Mauro* policy to be neutral applies here, *see Mauro,* 188 F.3d at 1061, and the regulation furthers an interest "unrelated to the suppression of expression," *Thornburgh,* 490 U.S. at 415, 109 S.Ct. 1874, the prison regulation passes *Turner*'s first prong. In other words, there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it. We thus turn our attention to the remaining prongs of the *Turner* inquiry.

Turner's second prong prompts us to examine whether there are alternative means of exercising the right in question. *See Turner,* 482 U.S. at 90, 107 S.Ct. 2254. "In applying this factor, 'the right in question must be viewed sensibly and expansively.'" *Mauro,* 188 F.3d at 1061 (quoting *Thornburgh,* 490 U.S. at 417, 109 S.Ct. 1874). Here an inmate's right to receive sexually explicit communications is at issue. As with the regulation that was challenged in *Mauro,* the policy banning such materials "does not ban sexually explicit letters between inmates and others, nor does it ban sexually explicit articles or photographs of clothed females." *Id.* Indeed, the regulation at issue here gives prisoners access to a larger universe of materials than the regulation that was upheld in *Mauro:* Frost evidently may access sexually explicit publications that do

*Walker.* In adopting *Amatel*'s reasoning, the *Mauro* court rejected Judge Wald's dissent in *Amatel.* Judge Wald had argued that the *Amatel* majority was placing itself in direct conflict with the Ninth Circuit's *Walker* opinion:

The majority's apparent conclusion that the government bears no responsibility for compiling evidence to support the breadth of its ban—in other words, that the courts may simply hypothesize a rational connection—runs counter to the wisdom of several other circuit courts. *See, e.g., ... Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir.1990).

*Amatel,* 156 F.3d at 208 (Wald, J., dissenting). Thus, our court has already implicitly rejected

the view that *Walker* and *Mauro* are irreconcilable. Today we are more explicit in our rejection of that view.

9. The *Mauro* court held that the "relationship between the possession of sexually explicit materials and the ... sexual harassment of female officers [and] jail security ... is clear." 188 F.3d at 1060. Here, the prison has banned the possession of a subclass of sexually explicit materials—those depicting sexual penetration. We believe that the relationship here is at least as clear as it was in *Mauro.*

not depict actual penetration. We thus conclude that the policy satisfies *Turner*'s second prong.

The third prong of *Turner* requires us to assess the consequences of accommodating the asserted constitutional right for "prison personnel, other inmates, and the allocation of prison resources." *Id.* Again, we follow the *Mauro* court's analysis of the more restrictive regulation at issue there. As our prior analysis indicates, Frost has not met his burden of refuting the prison's claim that allowing inmates to have unrestricted access to materials depicting sexual penetration would threaten the security of inmates and of guards who might be subjected to sexual harassment as a result. The district court's conclusion that allowing images depicting sexual penetration could create a "ripple effect" within the institution because of the likelihood that such materials would prompt bartering among inmates, disputes over possession, and contribute to the sexual harassment of female detention officers was not erroneous. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90, 107 S.Ct. 2254. The prison regulation thus does not run aground of prong three.

The final prong of *Turner* charges us to explore whether the inmate can articulate alternatives to the regulation at issue that would "fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests...." *Id.* at 91, 107 S.Ct. 2254. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* at 90, 107 S.Ct. 2254. Frost contends that the prison could subject individual inmates who showed a female staff member an image depicting penetration to disciplinary sanctions, confiscate the pornographic materials of said inmate, or revoke the right of such prisoners to receive sexually ex-

plicit magazines in the future. But, as the district court concluded, forcing prison officials to wait until after violations have occurred before restricting inmates' access to these materials would unduly tie the hands of prison officials who see the need for preventive measures. Furthermore, Frost's proposed alternative does not address the potential for such material to be passed among inmates. Thus, the district court correctly ruled that Frost's alternative is not appropriately feasible and that the policy does not offend *Turner*'s fourth prong. Because the prison's restriction on the receipt of images depicting sexual penetration dexterously parries *Turner*'s various prongs, we conclude that the regulation does not unconstitutionally abridge Frost's First Amendment rights.

Because the Defendants did not violate Frost's First Amendment rights, it is unnecessary for us to reach the district court's alternative grounds for summary judgment—that the Defendants were entitled to qualified immunity on the First Amendment claims.

### V.

█ Frost also contends that, with respect to the CDs, the district court erred by granting the Defendants' motion for summary judgment on the ground that the Defendants returned the CDs pursuant to BMG's request. The Defendants point out that they returned the CDs only at BMG's behest and that they determined that Frost had not paid for the CDs before doing so. On this record, there is no evidence that the ADOC officials violated Frost's clearly established rights by returning the CDs. Leaving questions of notice aside, the dispute over the CDs' return is between Frost and BMG. Therefore, the district judge's decision to grant the Defendants' motion for summary judgment on this claim was not erroneous.

### VI.

We cannot decide on the record before us whether the district court correctly ruled that Frost must enforce his rights

under *Hook* through the *Hook* class action, which involves a suit by Arizona inmates challenging various prison regulations. *See Hook v. Arizona,* No. CIV–73–97–PHX–CAM (D.Ariz. Oct. 19, 1973). To the extent that a class action involving the same issues raised by Frost is currently pending in the District of Arizona, Frost may have to bring all of his related claims for equitable relief, which would include his equitable claim for contempt of court, *see Gates v. Shinn,* 98 F.3d 463, 466 (9th Cir.1996), through *Hook* class counsel. *See Crawford v. Bell,* 599 F.2d 890, 892–93 (9th Cir.1979). Although it appears that a class action was certified in *Hook* in 1994, nothing in the record or briefs filed by the parties explains the status or scope of the 1994 class proceedings. As a result, we remand this case to the district court to ascertain the current status of the *Hook* class action, and to determine whether Frost should bring his equitable claims for relief through class counsel.

### VII.

Finally, we decide that the district court properly granted summary judgment with respect to Larry Barrows ("Barrows"). Frost incorrectly identified Barrows as the individual who interviewed him when Frost appealed the withholding of the October 1995 issue of *Penthouse.* However, the record shows that the person who conducted the interview was Deputy Warden David Bourgeous, who is not named as a defendant in Frost's complaint. Because Barrows' only connection to Frost's action is in his capacity as the incorrectly identified interviewer, the district court's grant of summary judgment is affirmed with respect to Barrows.

Based on the foregoing, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this decision. Each party will pay its own costs.