Garrison S. JOHNSON, Plaintiff–
Appellant,

v.

State of CALIFORNIA; James H. Go-
mez, Director, Department of Correc-
tions; James Rowland, Defendants–
Appellees.

No. 01–56436.

United States Court of Appeals,
Ninth Circuit.

July 28, 2003.

Lois D. Thompson, Aaron P. Allan, Tan-
ya L. Forsheit, Proskauer Rose, LLP, Los
Angeles, CA, and Jeffrey Thomas Garcia
Hilger, Jeffrey T.G. Hilger Law Offices,
Culver City, CA, for Plaintiff–Appellant.

Sara Turner, San Francisco, CA, for
Defendants–Appellees.

Before: HUG, BRUNETTI, and
O'SCANNLAIN, Circuit Judges.

PER CURIAM Order; Dissent by Judge
FERGUSON.

### ORDER

The panel has voted unanimously to
deny the petition for rehearing. Judge
O'Scannlain voted to deny the petition for
rehearing en banc, and Judges Hug and
Brunetti so recommended.

The full court was advised of the Sug-
gestion for Rehearing En Banc. A judge of
this court requested a vote on whether to
rehear the matter en banc. The matter
failed to receive a majority of the votes of
the nonrecused active judges in favor of en
banc consideration.

The Petition and the Suggestion are
thus DENIED.

FERGUSON, Circuit Judge, with whom
Circuit Judges PREGERSON, D.W.
NELSON, and REINHARDT join,
dissenting from our court's denial of
rehearing en banc.

I respectfully dissent from the order
denying rehearing en banc. Over thirty
years ago, the Supreme Court sought to
end officially sanctioned racial segregation
in our prison system by striking down
statutes requiring "segregation of the
races in prisons and jails" as violating the
Fourteenth Amendment. *See Lee v.
Washington,* 390 U.S. 333, 334, 88 S.Ct.
994, 19 L.Ed.2d 1212 (1968) (per curiam).
The panel's opinion threatens to undo that
achievement by altogether removing the
burden on prison officials to justify funda-
mentally suspect policies classifying pris-
oners on the basis of race. The decision
impermissibly construes the Court's deci-
sion in *Turner v. Safley,* 482 U.S. 78, 89,
107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), to
overrule *Lee,* in the process failing to ac-
cord to the Supreme Court the exclusive
"prerogative [to] overrul[e] its own deci-
sions." *Rodriguez de Quijas v. Shear-
son/American Express, Inc.,* 490 U.S. 477,
484, 109 S.Ct. 1917, 104 L.Ed.2d 526
(1989). The panel's decision ignores the
Supreme Court's repeated and unequivocal
command that "all racial classifications im-
posed by the government 'must be ana-
lyzed by a reviewing court under strict
scrutiny.'" *Grutter v. Bollinger,* —— U.S.
——, ——, 123 S.Ct. 2325, 2337, ——
L.Ed.2d —— (2003) (quoting *Adarand
Constructors, Inc. v. Pena,* 515 U.S. 200,
227, 115 S.Ct. 2097, 132 L.Ed.2d 158
(1995)), and fails to recognize that *Turner*
analysis is inapplicable in cases, such as
this one, in which the right asserted is not
inconsistent with legitimate penological ob-
jectives.

**I. Strict Scrutiny is the Applicable
Standard for All Race–Based Gov-
ernment Classifications, Regardless
of the Government Actor**

In cases decided both before and after
*Turner v. Safley,* the Supreme Court has
clearly held that government classifications
based on race are, without exception, sub-
ject to strict scrutiny. *See id.; see also
Adarand,* 515 U.S. at 227, 115 S.Ct. 2097;

*Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). The purpose of strict scrutiny is to " 'smoke out' illegitimate uses of race by assuring that [a state actor] is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.' " *Adarand*, 515 U.S. at 226, 115 S.Ct. 2097 (quoting *Croson*, 488 U.S. at 493, 109 S.Ct. 706). The fact that a racially discriminatory classification scheme has a "benign" or well-intentioned purpose does not relieve a government actor from the burden to justify such a policy. *See id.*

Consistent with the rule requiring strict scrutiny for all government actors, the Court's per curiam decision in *Lee* placed the burden on prison officials to justify segregationist policies, embracing in affirmance the Alabama District Court's rejection of prison officials' argument that "the practice of racial segregation in penal facilities is a matter of routine prison security and discipline and is, therefore, not within the scope of permissible inquiry by the courts." *Washington v. Lee*, 263 F.Supp. 327, 331 (M.D.Al.1966); *see also Lee*, 390 U.S. at 334, 88 S.Ct. 994. Although the *Lee* Court acknowledged prisons' continuing need to make "allowance for the necessities of prison security and discipline," 390 U.S. at 334, 88 S.Ct. 994, *Lee* nevertheless applied heightened scrutiny to the contested regulations, as cases construing *Lee* have made clear. In *Hudson v. Palmer*, for example, the Court cited *Lee* for the holding "that invidious racial discrimination is as intolerable within a prison as

outside, except as may be *essential* to 'prison security and discipline.' " 468 U.S. 517, 523, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (quoting *Lee*, 390 U.S. at 334, 88 S.Ct. 994) (emphasis added). More recently, Justice Scalia specifically noted that *Lee's* "necessities" exception is applicable "only [in] a social emergency rising to the level of imminent danger to life and limb ... [such as] a prison race riot." *Croson*, 488 U.S. at 520–21, 109 S.Ct. 706 (Scalia, J., concurring); *see also Grutter*, —— U.S. at ——, 123 S.Ct. at 2352 (Thomas, J., dissenting) (citing *Lee* as "indicating that protecting prisoners from violence might justify narrowly tailored racial discrimination.").

The panel concedes that the Court's decision in *Lee* has direct application in this case, *Johnson v. Rowland*, 321 F.3d 791, 797–98 (2003), but nevertheless determines that *Turner* is controlling. *Id.* at 798. The panel announces, without citing any support for its contention, that *Turner* "was not merely a cosmetic change in the Court's language ... [it] lowered the prison administrators' burden to justify race-based policies [and placed this 'heavy burden' on] the inmate." *Id.* at 798–99. Implicitly, the panel presumes that *Lee* required a heightened standard, but notes that even if "Johnson is correct that *Lee* would have required actual violence ... Johnson's argument cannot withstand our consistent application of *Turner.*" *Id.* at 801 n. 8.

No Supreme Court case supports the panel's claim that *Turner* applies in the context of suspect-class equal protection claims, let alone that it implicitly overruled *Lee*.[1] In light of *Lee's* directly controlling

---

1. Even *Washington v. Harper*, 494 U.S. 210, 224, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), upon which the panel partially relies, did not suggest that prison officials, in contrast to *all* other government actors, are relieved from the obligation to justify race-based policies by

presenting a compelling interest and a narrowly tailored solution. Although *Washington v. Harper* purported to control every subsequent prison case, *see Washington*, 494 U.S. at 224, 110 S.Ct. 1028, it cannot do so. "[G]eneral expressions, in every opinion, are

holding and the Supreme Court's repeated command to apply strict scrutiny to all race-based classifications, the panel simply does not have the authority to interpret *Turner* as requiring a different level of review. "If a precedent of th[e Supreme] Court had direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas,* 490 U.S. at 484, 109 S.Ct. 1917; *see also Hohn v. United States,* 524 U.S. 236, 252–53, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."). The panel may not lower the standard that has been clearly articulated in Supreme Court case law in order to allow the policy to survive review.

The effect of the panel's dismissal of the relevant Supreme Court case law is to create a dangerous and unwarranted exception to the general rule for prison officials. If military officials acting during wartime are subject to strict scrutiny, *see Toyosaburo Korematsu v. United States,* 323 U.S. 214, 217–18, 65 S.Ct. 193, 89 L.Ed. 194 (1944), then certainly prison officials engaging in the routine performance of their duties should be subject to it as well. Nevertheless, the opinion presumes that prison officials are so uniquely free of the taint of racism that an exception should be created just for them.

Our race-based equal protection jurisprudence does not permit an exception to the strict scrutiny rule. " 'Absent searching judicial inquiry into the justification for ... race-based measures, there is simply no way of determining ... what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.' " *Adarand,* 515 U.S. at 226, 115 S.Ct. 2097 (quoting *Croson,* 488 U.S. at 493, 109 S.Ct. 706). " '[B]ecause classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classifications be clearly identified and unquestionably legitimate ... racial classifications are simply too pernicious to permit any but the most exacting connection between justification and classification.' " *Id.* at 236, 109 S.Ct. 706 (quoting *Fullilove v. Klutznick,* 448 U.S. 448, 533–35, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (dissenting opinion)).

Deferring to the alleged "common-sense" of state officials on matters of race is fundamentally at odds with the requirements and purpose of the Fourteenth Amendment. *See Adarand,* 515 U.S. at 228, 115 S.Ct. 2097. Yet this is precisely what the panel does by holding that the governmment is "not required to make any evidentiary connection concerning the connection [between the policy and prison violence]." *Rowland,* 321 F.3d at 803 (quoting *Frost v. Symington,* 197 F.3d 348, 357 (9th Cir.1999)).[2] Regardless of the potential for abuse, the decision holds that reviewing courts must defer to prison offi-

to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cohens v.Virginia,* 6 Wheat. 264, 19 U.S. 264, 399, 5 L.Ed. 257 (1821).

2. Although the panel asserts that "the high level of racial violence in the [prison] is well documented" and that "this is hardly a case where the prison administrators are acting on an unsubstantiated record," *id.* at 801 n. 9, the bulk of the facts the panel presents are, legally speaking, irrelevant; nothing in the decision's holding requires the prison to justify the policy in any real fashion.

cial's "common sense" as to whether there is a legitimate safety concern, and must presume that what prison officials "feel" might happen is actually what will happen.[3]

Under the panel's test, if a prison official were to announce that prisoners could no longer visit with spouses or children of a visibly different race, based on the official's entirely unsupported belief that there would be subsequent racial violence based on the sometimes charged nature of interracial relationships, we would have to shrug our shoulders and defer. The prisoner would have to prove that there would *not* be a riot, which, in a racist society, would simply never be possible. It is certainly "plausible" that such a riot could ensue: our society, as well as our prisons, contains enough racists that almost any interracial interaction could potentially lead to conflict. *See Adarand,* 515 U.S. at 237, 115 S.Ct. 2097 ("the unhappy persistence of both the practice and lingering effects of racial discrimination against minority groups in this country is an unfortunate reality."). More to the point, our society, as well as our prisons, contains an abundance of persons who *believe* that *any* cross-racial interaction is dangerous, regardless of whether their beliefs are based in fact.[4]

Both the Fifth and the Seventh Circuits have refused to accord such extreme deference, recognizing that, in the context of race, more must be required. In *Sockwell v. Phelps,* the Fifth Circuit considered and rejected a policy nearly identical to the one put forth by the prison in this case and supported by nearly identical "safety" justifications. *See* 20 F.3d 187, 191–92 (5th Cir.1994).[5] The *Sockwell* court implicitly rejected *Turner,* placing the burden of proof to justify the policy on prison authorities and refusing to accept the prison authorities' "generalized or vague fear of racial violence [as] a sufficient justification for a broad policy of[residential] racial segregation." 20 F.3d at 191.[6] Similarly, in *Black v. Lane,* 824 F.2d 561, 562 (7th Cir.1987) (decided subsequent to *Turner*), the Seventh Circuit specifically held that "absent a compelling state interest, racial discrimination in administering prisons vi-

---

**3.** The prison official affidavits relied on by the panel do not cite one concrete instance or statistical example of racial violence, instead referring only to the unsubstantiated "beliefs" of prison officials about what they presume will happen.

**4.** The panel's assertion that it is patently obvious that the policy makes good "commonsense" is, in fact, belied by studies addressing the question. *See* Chad Trulson & James W. Marquart, *The Caged Melting Pot: Toward an Understanding of the Consequences of Desegregation in Prisons,* 37 LAW & SOC'Y REV. 743, 774 (2002) (study of inmate-on-inmate assault data which found that "over [ten years], the rate of violence between inmates segregated by race in double cells surpassed the rate among those racially integrated.").

**5.** In *Sockwell,* Texas prison authorities actually presented more concrete evidence than what was offered in the instant case. In support of their contention that racially segre-

gated two-man cells were needed to increase security, they asserted that:

> (1) prison guards were unable to visually monitor each … cell; … (3) two instances occurred in which black and white prisoners housed together became violent; (4) racial supremacy groups existed within the prison ranks; and (5) interracial conflict may have triggered more generalized racial violence.

20 F.3d at 191.

**6.** Contrary to the panel's suggestion, *see Johnson v. Rowland,* 321 F.3d at 797 n. 5, the fact that there appeared to be disparate treatment between the cells did not play any role in the *Sockwell* court's analysis. *See* 20 F.3d at 191. Unlike the panel, the *Sockwell* court was not under the illusion that racially discriminatory government policies are acceptable so long as they produce "equal" results. *See Brown v. Bd. of Educ.,* 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

olates the Equal Protection Clause." *Id.* (citing *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).

Other portions of the panel's analysis reveal just as starkly the trouble with applying *Turner's* reasoning to a race-based equal protection claim. For example, in finding that Johnson has a "reasonable alternative" to exercise his right to be free from discrimination because he is not subject to segregation during meals and recreational time, the panel essentially asserts that if the state only discriminates sometimes, no harm is done. *See Johnson v. Rowland,* 321 F.3d at 804. This close-enough argument is akin to asserting that if a school-child only has to go to a segregated school one-third of the year, the requirements of *Brown v. Board of Education* are met. As the District of Columbia Circuit stated in *Pitts v. Thornburgh,* the right to be free from discrimination is the right to be free from a particular, definite, constitutional harm, not the right to engage in a particular activity or associate with particular persons. *See* 866 F.2d 1450, 1455 (D.C.Cir.1989) ("While an equal protection claim ... is, in one sense, a personal right ... the claim is also a demand that government action that affects an individual not be predicated upon constitutionally defective reasoning."); *see also Adarand,* 515 U.S. at 229–30, 115 S.Ct. 2097.

When it comes to matters of race, the "common-sense" of state officials is frequently the opposite of sensible or rational, and a searching inquiry into the motives and alternatives to the state actor's plan is therefore required. The Fourteenth Amendment simply does not permit any level of review except for strict scrutiny, let alone the excessive deference that the panel applies.

There is little merit to the panel's suggestion that strict scrutiny of race-based policies would unnecessarily limit prison officials' ability to effectively manage prisons or open the floodgates to frivolous litigation. Recognizing that there are unique circumstances under which a race-based classification may be permissible, the Supreme Court has specifically rejected the notion that "strict scrutiny is[ ] 'strict in theory, but fatal in fact.' " *Grutter,* —— U.S. at ——, 123 S.Ct. at 2338 (quoting *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097). "Not every decision influenced by race is equally objectionable and strict scrutiny is designed to provide a framework for carefully examining the importance and sincerity of the reasons advanced by the governmental decision maker for the use of race in that particular context." *Id. Grutter* makes clear that strict scrutiny still allows for a measure of deference to government actors acting within their particular sphere of competence. *Id.* at 2339. However, the "scrutiny of the interest asserted by [government actors] is no less strict for taking into account complex ... judgments in an area that lies primarily within [their] expertise." *Id.* The burden is squarely on the government to establish both that its interest is compelling and that its means are narrowly tailored.

It is perfectly possible that a prison could develop a race-based policy that would survive strict scrutiny analysis, given the clearly compelling interest in maintaining safety and order in prisons. Indeed, it is possible, even likely, that prison officials could show that the current policy meets the test. Contrary to the panel's suggestion, imposing the burden of justifying such policies on prison administrators is not unduly burdensome, given (I assume) the exceptional rarity of policies that are openly discriminatory. While any review of prison policies requires the court to appreciate the difficulties encountered by prison officials in maintaining a safe environment, *see Pitts,* 866 F.2d at 1455, it

is simply not the case that either *Turner* or any other case in the Supreme Court's equal protection jurisprudence permits prisons to engage in racial discrimination without a compelling justification and a showing that the policy is narrowly tailored to meet the alleged safety need.

## II. Turner Analysis Does Not Control Where, As Here, the Right Asserted Is Not Inconsistent with the Legitimate Objectives of the Penal System

*Turner* analysis is inapplicable not only because the Supreme Court has clearly stated that strict scrutiny applies in all cases in which the government creates racial classifications, but because the constitutional right at issue is not "inconsistent . . . with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). As the Supreme Court's most recent prison case makes clear, a consideration of whether the right at issue is "inconsistent with proper incarceration" is a crucial step in determining whether or not *Turner* analysis applies. *See Overton v. Bazzetta,* — U.S. —, —, 123 S.Ct. 2162, 2167, — L.Ed.2d — (2003); *see also Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (rejecting inmate First Amendment claim where "ban [on solicitation and meetings] . . . was rationally related to the reasonable, indeed to the central, objectives of prison administration."); *Jordan v. Gardner,* 986 F.2d 1521, 1530 (9th Cir. 1993) (rejecting application of *Turner* analysis in context of Eighth Amendment claim).

An individual's right to be free from state imposed racial discrimination cannot plausibly be said to be "inconsistent with the legitimate penological objectives of the corrections system," nor can it be said that a prison official's ability to discriminate between prisoners based on race is "central [to] the objectives of prison administration." Like the Eighth Amendment prohibition of cruel and unusual punishment, the Fourteenth Amendment's ban on invidious state discrimination specifically contemplates a limitation on state power that is "complementary" to the goals of effective imprisonment. *See Jordan,* 986 F.2d at 1530; *see also Pitts,* 866 F.2d at 1455. For this reason, the right to be free from state-sponsored segregationist policies is qualitatively different from other rights to which *Turner* has been applied. *Cf. Overton,* — U.S. at —, 123 S.Ct. at 2167 (applying *Turner* to freedom of association claims relating to family visitation); *Shaw v. Murphy,* 532 U.S. 223, 228, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (applying *Turner* to inmate first amendment challenge to prison regulation restricting inmate correspondence); *Washington v. Harper,* 494 U.S. 210, 221–23, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (applying *Turner* in context of due process challenge to involuntary medication of mentally ill prisoner); *O'Lone v. Shabazz,* 482 U.S. 342, 349–50, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (applying *Turner* in case challenging right of prison to limit attendance at particular religious services).

Unlike the rights asserted in previous prison cases, the right to be free from state-sponsored segregation is central to the legitimacy of our system of justice, including the penal system. In the same way that the Eighth Amendment embodies an understanding that the penal system loses legitimacy to the extent that its methods are abhorrent on their face, so too the Fourteenth Amendment acknowledges that government power retains legitimacy in direct proportion to the extent that its objectives are carried out free of the stigma of inequitable or discriminatory classification systems, especially ones

based on inherently arbitrary factors like race.

In *Pitts,* the District of Columbia Circuit explicitly rejected the application of *Turner* in the context of a suspect class equal protection claim. *Pitts,* 866 F.2d at 1453. Although the claim involved issues that did "not directly implicate either prison security or control of inmate behavior," *id.* at 1454, the Court specifically noted that the Supreme Court "has commanded [that suspect classifications] demand[ ] the court's special attention." *Id.* at 1454–55. The *Pitts* court also noted that the fact that an equal protection claim "charges invidiousness, rather than an unwarranted interference with constitutionally secured liberties," was relevant to the level of scrutiny it applied. *Id.* at 1455.

In short, *Turner* analysis is simply not applicable when the right at issue is not only not inconsistent with, but complementary to the needs of effective imprisonment. The panel's failure to recognize this distinction renders an already erroneous decision even more problematic.

\*   \*   \*   \*   \*   \*

The panel's decision gives *carte blanche* to prison officials to impose their own notions of racial hatred and conflict upon prisoners, regardless of whether these notions are based in fact or deeply-held stereotypes. The decision ignores the applicable standard of review and the primary purpose of the Fourteenth Amendment's prohibition on racial discrimination, which is to limit states' power to create fundamentally suspect racial classification schemes. I therefore dissent from the denial of rehearing en banc.