**Todd Lewis ASHKER, Plaintiff,**

v.

**CALIFORNIA DEPARTMENT OF CORRECTIONS, et al., Defendants.**

No. C 97–01109 CW.

United States District Court, N.D. California.

Sept. 11, 2002.

Stephen T. Gargaro, Stephen T. Gargaro Law Offices, San Francisco, CA, Herman A.D. Franck, V, Sacramento, CA, for Plaintiff.

Scott C. Mather, CA State Attorney General's Office, San Francisco, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WILKEN, District Judge.

Plaintiff Todd Ashker, an inmate housed in the Security Housing Unit (SHU) at Pelican Bay State Prison (PBSP), moves for summary judgment on his First Amendment book label claim. Defendant California Department of Corrections (CDC) opposes the motion. Ashker has not filed a reply. The matter was heard on April 19, 2002. Having considered all of the papers filed by the parties and oral argument on the motion, the Court GRANTS Plaintiff's motion for summary judgment (Docket No. 179).

### FACTUAL BACKGROUND

The parties agreed at oral argument that there are no disputes of material fact. Thus, the following facts are taken as true:

There is a high number of inmates housed in the SHU who are involved in gang activity. Declaration of Sergeant Glen Rodman (Rodman Decl.) at ¶ 3. Members of gangs are more likely than prisoners housed in the general population to receive contraband, including drugs or encrypted messages in publications. Rodman Decl. at ¶ 4. To prevent inmates housed in the SHU from receiving contraband, PBSP Operational Procedure 806 outlines a "Special Purchases" program. Declaration of Herman Franck (Franck Decl.), Exhibit (Exh.) A. That regulation provides in pertinent part:

> Personal property items authorized in accordance with this plan may be purchased by the inmate through special purchase procedures.... Special purchases will encompass all incoming property to include ... books/periodicals/magazines/calendars....

Books/periodicals/magazines/calendars may be ordered from a mailorder [sic] books [sic] store or publisher and approved book labels must be attached. All book address label forms must be signed by the inmate to receive the item(s), and then signed by an R & R [Receiving and Release] staff member. Any packages from a book vendor or publisher must have a book label with a vendor stamp attached. Packages without the vendor stamp, label, or the required signatures, will be returned to sender. All property items will be ordered from an approved vendor. The package will be ordered by the inmate....

Franck Decl., Exh. A. Procedure No. 806(L)(2) provides that an inmate may receive one book package per month, but may possess no more than ten books and magazines at any one time. Franck Decl., Exh. A.

Regulation 806(L)(1) provides:

Books, magazines and calendars may be sent in from an approved mail order vendor. All book packages must have an approved book label attached with the vendor stamp. Books received without a book label or vendor stamp will be returned to sender (RTS).

Franck Decl., Exh. A.

Procedure No. 806(Y) provides in relevant part that "all property and packages received at [PBSP] will be searched by custodial staff prior to delivery to the addressee." Franck Decl., Exh. A; Rodman Decl. at ¶ 3. When shipments of books arrive without a book label, they too are opened to determine the origin of the package. Rodman Decl. at ¶ 4. Following a manual inspection, custodial staff may subject an item to inspection by way of a fluoroscope machine. Rodman Decl. at ¶ 3. The fluoroscope machine has on one occasion failed to detect drugs included in mail addressed to an inmate, and cannot detect encrypted messages placed in publications by third parties. *Id.*

The 2002 version of the PBSP book label, which is substantially similar to the label used in 1997, must be included by the inmate in his order when submitted to the book seller. Declaration of Todd Ashker (Ashker Decl.), Exh. A. The label requires that the inmate provide his name, Department of Corrections number, and housing unit. *Id.* The label also lists PBSP's address next to the designation "ship to." *Id.* At the bottom of the label, a clause releases PBSP and its staff from liability for the removal and disposal of covers from hard cover books or other alteration of any books, and another clause indicates that should the inmate refuse the procedure, the inmate will be required to mail the book to his home at his expense, or donate it, or it will be disposed of by PBSP staff. *Id.* In the upper left-hand corner of the label is a blank box in which the book seller is instructed to attach its "vendor stamp." *Id.*

The label is the top half of a page titled "Book Address Form." The vendor is to cut on the dotted line, separating the label from the bottom half of the form, and affix the label to the package being sent to the inmate. *Id.* Beneath the dotted line, in larger print, is the following information: "ATTENTION VENDORS: THIS BOOK ADDRESS LABEL MUST BE ATTACHED TO THE OUTSIDE OF THE BOOK PACKAGE WHERE IT IS VISIBLE TO SHU R & R STAFF OR IT WILL BE RETURNED TO THE SENDER UNOPENED. (NO EXCEPTIONS)." Ashker Decl., Exh. A; Rodman Decl. at ¶ 5. The form also indicates that "if the book arrives without an approved books address label and/or the necessary signatures, the book will be returned to sender at inmates [sic] expense...." *Id.* Immediately below that warning, the form

provides that "[a]ny item being returned to vendor/sender will be shipped at inmates [sic] expense." *Id.*

Sergeant Glen Rodman, who was assigned to PBSP's R & R division in October, 2001, and to the SHU for eleven years prior to his R & R designation, further explains mailing procedures for shipments of books and reading materials. Rodman states that non-approved packages arriving by United States Postal Service (USPS) are returned at no expense to the inmate, but that United Parcel Service (UPS) will only return damaged packages at no additional expense. Rodman Decl. at ¶¶ 1, 6. Thus, unopened, undamaged packages shipped via UPS are returned at the inmate's expense. *Id.* The inmate is also given the option of having the package mailed to a friend or family member. *Id.* The package is stored for thirty days until the inmate provides funds for mailing and an address to which the package is to be sent. *Id.* If the inmate does not provide funds or a mailing address, or if the inmate does not file an administrative appeal of the withholding of his books, PBSP will dispose of the property after providing notice to the inmate. *Id.*

The purpose of the "book label" policy is to ensure that books or periodicals are shipped to PBSP inmates directly from authorized publication vendors, rather than from inmates' friends or family members, thus decreasing the possibility that contraband will be included in such packages. Rodman Decl. at ¶ 4. Though the vendor label requirement cannot prevent all introduction of contraband, PBSP officials believe it reduces the possibility of such security breaches. *Id.* The vendor label policy also is intended to decrease the number of packages that require individual inspection by prison mailroom employees. Rodman Decl. at ¶ 6. Mail received at SHU and all property issuing to SHU inmates is managed by three per-sons. *Id.* A package from a source other than an approved vendor may be returned to the sender without further inspection, allowing those persons to focus on other tasks. *Id.*

In October, 1996, Ashker's friend, Didar Khalsa, placed an order with Barnes & Noble Booksellers for four books to be shipped to Ashker. Declaration of Didar Khalsa (Khalsa Decl.) at ¶ 10. Ms. Khalsa included the necessary book label with her order. *Id.* As of December, 1996, Ashker had not received the books. *Id.* Ms. Khalsa contacted PBSP–SHU's property room, and was told that between November and December, 1996, over one hundred book packages were returned to sender because of the vendor's failure to place the book label on the box, or because the vendor did not place its vendor stamp in the appropriate box on the label. *Id.* Ashker received the books several months later, after Ms. Khalsa took the book label form to the book store to ensure its proper completion. *Id.;* Ashker Decl. at ¶ 4.

The difficulties imposed by the book label requirement greatly frustrated Ms. Khalsa, so that Ashker no longer asks her to assist him in obtaining books. Kahlsa Decl. at ¶ 10; Ashker Decl. at ¶ 2. Ashker and Ms. Khalsa no longer contact one another, and Ashker does not have another friend who is willing to assist him in procuring books. Ashker Decl. at ¶ 9. As a result, Ashker has not received any books for approximately two years. *Id.*

On an unknown date in 1996, a shipment of books from Barnes & Noble Booksellers, intended for Ashker's cellmate, Frank Clement, was returned to Barnes & Noble by PBSP–SHU officials for failure to attach a book address label. Declaration of Frank Clement (Clement Decl.), Exh. A. It appears that Clement was not aware of the label requirement when he placed this or-

der and thus failed to include the label when submitting his order form. *Id.*

On December 11, 1998, Clement placed an order for various books with Penguin Putnam Publishers, Inc., and included the required book label. Clement Decl. at ¶ 14. On January 12, 1999, this order was received and held by mail room staff at PBSP–SHU as a result of Penguin Putnam's failure to place the book label on the box in which it shipped Clement's order. Clement Decl., Exh. E. By letter dated February 9, 1999, a Penguin Putnam employee acknowledged the publisher's inability to utilize the book label as a result of its practice of receiving orders and filling them in different locations. *Id.* Clement was informed by PBSP–SHU officials that he would be required to return the item to Penguin Putnam at his expense, and Clement asked that the box be sent to his father. *Id.* By letter dated July 20, 2000, Penguin Putnam informed Clement that it would no longer ship books to correctional facilities. *Id.*

On January 25, 2000, PBSP–SHU refused delivery and returned a shipment of books ordered by Clement from Daw Books, Inc. because Daw Books had not included a book label on its shipment. Clement Decl., Exh. F. Clement appealed the prison's action, but his appeal was denied by prison officials on grounds that Clement's signature on the book label form he sent to Daw Books indicated his agreement to be bound by the prison's book label requirement. *Id.*

### PROCEDURAL BACKGROUND

In April, 1997, Ashker filed a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983 alleging violations of his First and Eighth Amendment rights.[1] Additionally, Ashker raised separate claims under the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and for medical malpractice and negligence.

On December 15, 1997, CDC sought summary judgment on Ashker's claims. On September 30, 1999, the Court granted CDC's motion in part, but denied the motion regarding several claims, including Ashker's First Amendment book label claim for injunctive relief which is at issue here (September, 1999 order).

In the September, 1999 order, the Court concluded that PBSP's policy requiring that book packages originate from vendors was reasonably related to its legitimate penological interest in ensuring that contraband did not enter the prison. However, the Court noted that the record was not clear as to whether the form required the inmate or the vendor to release PBSP from liability for confiscation of items that did not meet PBSP's requirements. Additionally, the Court noted a contradiction between the label's statement that items would be returned at the inmate's·expense, and PBSP officials' statements that the inmates would not be charged for return shipping. Thus, the Court determined that there were disputes of material fact regarding whether Ashker's First Amendment right to. receive books was overly burdened by the prison's book label policy, and that summary judgment for Defendants was not warranted.

On August 1, 2000, CDC again sought summary judgment on several of Ashker's claims, including the book label claim at issue here. In a January 18, 2001 order, the Court indicated that PBSP's book label policy appeared duplicative of its parallel requirement that all packages addressed to inmates be searched, whether or not the package had the appropriate book label. The Court determined that CDC had not

---

1. Plaintiff is now represented by counsel, attorney Herman Franck.

explained why its concern about introduction of contraband by a third party was not alleviated by the search of all packages. The Court indicated that it was also not clear whether the inmate was required to pay for the cost of postage to return packages not shipped with a book label. The Court concluded that Ashker had raised a sufficient dispute of material fact to preclude granting summary judgment to CDC on the book label claim. Summary judgment was also denied on Ashker's Eighth Amendment and State law claims relating to his medical care.

On March 6, 2002, Ashker filed this motion for summary judgment solely on his First Amendment book label claim. Ashker seeks relief in the form of a declaratory judgment that PBSP's book label policy unreasonably restricts his First Amendment right to receive books and other reading materials, and a permanent, prison-wide injunction barring enforcement of the book label requirement. Meanwhile, the parties settled Ashker's medical care claims, leaving only this First Amendment claim unresolved.

## LEGAL STANDARD

### I. Motion for Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R.Civ.Proc. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288–89 (9th Cir.1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex,* 477 U.S. at 324,

106 S.Ct. 2548; *Eisenberg,* 815 F.2d at 1289. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Intel Corp. v. Hartford Accident and Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. *See id.; Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 885, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *see also Bhan v. NME Hosp., Inc.,* 929 F.2d 1404, 1409 (9th Cir.1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan,* 929 F.2d at 1409. A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

## II. Prisoners' Constitutional Claims

■ "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Where prison rules or regulations impede the exercise of a prisoner's constitutional rights, federal courts must discharge their duty to protect those rights. *See id.* However, courts must be aware that they are "ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* (citation and internal quotation marks omitted). Where the regulations of a State prison are involved, "federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Id.* at 85, 107 S.Ct. 2254 (citation and internal quotation marks omitted).

■ A prison regulation that limits a prisoner's exercise of his or her constitutional rights will thus be upheld where it "reasonably relate[s] to a legitimate penological interest." *Id.* at 89–90, 107 S.Ct. 2254. This determination entails consideration of four factors: (1) whether there is a rational relationship between the regulation and the proffered legitimate government interest; (2) whether inmates have alternative means of exercising their asserted rights; (3) how accommodation of the claimed constitutional right will affect guards, a prisoner's fellow inmates, and the allocation of prison resources; and (4) whether the policy is an "exaggerated response" to the jail's concerns. *Id.; see also Mauro v. Arpaio,* 188 F.3d 1054, 1058–59 (9th Cir.1999).

## DISCUSSION

### I. First Amendment Claim

■ It is well-settled that a prison inmate retains First Amendment rights not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Prison Legal News v. Cook,* 238 F.3d 1145, 1149 (9th Cir.2001). Regulations affecting prisoners' access to publications are valid only if they are reasonably related to legitimate penological interests. *See Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (citing *Turner,* 482 U.S. at 89, 107 S.Ct. 2254). Regulations to be viewed with caution include those which categorically prohibit access to a broad range of materials. *See Keenan v. Hall,* 83 F.3d 1083, 1093 (9th Cir.1996), *amended,* 135 F.3d 1318 (9th Cir.1998) (allowing challenge to prison's "publisher's only" rule that applied to soft-cover books); *see also Johnson v. Moore,* 948 F.2d 517, 520 (9th Cir.1991) (rule categorically preventing inmates from receiving soft-cover books and magazines not sent directly from publisher must be scrutinized closely). In the instant case, Ashker contends that PBSP's "book label" policy impedes his ability to receive books from legitimate commercial vendors, thus infringing his rights under the First Amendment. Because this claim implicates Ashker's right to receive numerous materials, this regulation must be reviewed closely. *See Johnson,* 948 F.2d at 520.

As stated above, the Court must first consider whether there is a rational relationship between PBSP's book label policy and the prison's proffered legitimate government interests. This requires that the Court weigh whether PBSP's objective is (1) legitimate and (2) neutral; and (3) whether the policy is rationally related to that objective. *See Mauro,* 188 F.3d at 1059.

As to the first consideration, the purpose of PBSP's "book label" policy is to ensure that books are shipped to PBSP inmates directly from publishers, thus decreasing the possibility that contraband

will be included in book packages. Rodman Decl. at ¶ 4.

The vendor label policy is also intended to decrease the number of packages that require individual inspection by prison mailroom employees. Rodman Decl. at ¶ 6. Preventing the introduction of contraband and ensuring prison security are legitimate penological interests. *Bell v. Wolfish*, 441 U.S. 520, 553–55, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (introduction of contraband); *Casey v. Lewis*, 4 F.3d 1516, 1520–21 (9th Cir.1993) (same); *Thornburgh*, 490 U.S. at 415, 109 S.Ct. 1874 (prison security); *Mauro*, 188 F.3d at 1059 (same). It is not clear that ensuring efficient mailroom operations is a legitimate penological objective, and CDC offers no argument on this point.

Second, this policy is not "neutral." The Supreme Court explained in *Thornburgh* that to meet *Turner's* neutrality test,

> the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Where ... prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are "neutral" in the technical sense in which we meant and used that term in *Turner*.

*Thornburgh*, 490 U.S. at 415–16, 109 S.Ct. 1874.

Although the label policy applies to packages of books, there is no concomitant policy for vendor labels to be attached to packages containing other items. Franck Decl., Exh. A. Operational Procedure 806(Z)(3) indicates that inmates may receive numerous materials through the "Special Purchases" program, including "tennis shoes, thermal tops and bottoms [and] approved appliances." *Id.*, Exh. A. CDC provides no evidence or argument that these items are less likely than books to be utilized for introducing contraband

into the prison. Thus, although the book label policy draws no distinction between publications, the fact that it applies to books but not to other items means that it is not neutral but is weighted against First Amendment activities.

Lastly, the regulation must be rationally related to PBSP's legitimate penological objectives. *Turner's* "rational relationship factor ... is a *sine qua non*." *Id.* at 1059 (citing *Walker*, 917 F.2d at 385). Thus, where the prison regulation fails to satisfy this factor, the court need not consider the remaining factors. Id. The burden of proof in challenges to prison regulations is set forth in *Frost v. Symington*, 197 F.3d 348 (9th Cir.1999). The initial burden is on the State to put forth a "common-sense" connection between its policy and a legitimate penological interest. If the State does so, the plaintiff must present evidence that refutes the connection. *Id.* at 357. The State must then present enough counter-evidence to show that the connection is not so "remote as to render the policy arbitrary or irrational." *Id.*

The evidence submitted by Ashker, and in fact the evidence submitted by CDC, refutes any common-sense connection between the book label policy and PBSP's legitimate goals of ensuring against contraband and providing prison safety. Ashker produces PBSP's own operational procedures which make clear, as this Court has noted in denying CDC's two prior motions for summary judgment, that the book label policy is duplicative of several other policies, and that in light of those policies, the book label policy is arbitrary.

CDC contends that the "book label" requirement ensures that books and periodicals are shipped to PBSP inmates directly from authorized vendors, rather than from the inmates' family or friends or by third parties. CDC argues that the book label policy thereby prevents inmates' family or

friends from ordering books or periodicals sent to their own addresses, lacing the package with contraband or encrypted messages, and then forwarding the package to the inmate with a vendor receipt and in vendor packaging.

CDC's penological interest in requiring that books are sent directly from an approved vendor can be satisfied by checking the vendor's address label and invoice in each book package. If the package had been sent by the vendor to a prisoner's friend, and then sent by the friend to the prisoner, the vendor's address label and invoice would demonstrate that the package was sent to the third party. Although a vendor's address label and invoice could be forged, CDC admitted at the hearing on this motion that its concerns regarding forged invoices and falsified vendor address labels are not alleviated by the book label, because it could be forged or falsified just as easily.

Furthermore, all personal property received by inmates in the mail, including books and magazines, is searched prior to delivery to the prisoner. Operational Procedure 806(Y) states that "all property and packages received at [PBSP] will be searched by custodial staff prior to delivery to the addressee." Franck Decl., Exh. A. At the hearing, CDC admitted that this policy applies regardless of whether the package contains a book label. *See* Rodman Decl. at ¶ 3 ("All items received into the institution are inspected by staff for contraband."), ¶ 4 ("If a package arrives without a vendor label or return address on the outside, the package will be opened to determine its origin."). CDC could articulate no scenario in which the book label policy provides a measure of security not afforded by these routine and mandatory searches. Even a legitimate package of books, including an authentic book label provided by the inmate, would be searched

by PBSP authorities prior to delivery to the inmate.

CDC contends that its search procedures are not entirely effective, so that the book label provides additional assurance that any package received by an inmate will be free of contraband. In his declaration, Sgt. Rodman states his familiarity with "at least one instance where drugs escaped recognition by a fluoroscope machine," and notes that "such machines cannot recognize encrypted material." Rodman Decl. at ¶ 3. Sgt. Rodman does not indicate whether a fluoroscope machine failed in a search of a shipment of books or periodicals, or simply standard mail. Indeed, Sgt. Rodman provides absolutely no specific facts regarding the alleged incident. In any event, as noted above, the presence or absence of a book label has no relation to whether PBSP staff will search an incoming package. Rather, all packages are subject to search. The fact that a fluoroscope machine is not entirely effective in recognizing contraband does not justify the policy.

The book label policy provides no greater protection against the introduction of encrypted materials to PBSP inmates beyond that provided by the requirement, discussed above, that book purchases be sent directly from an approved vendor. Whether or not a book label appears on a package, only a visual inspection of the suspect material, if that, would indicate the existence of coded messages. Thus, again, PBSP must open the package, regardless of the presence of a book label, to determine the presence of contraband.

Finally, as discussed above, at the hearing, CDC conceded that the book label policy applies only to shipments of books. CDC provides no evidence that the tennis shoes, thermal clothing or appliances are any less likely than books to be utilized as a method of introducing contraband to the

prison. Common sense would dictate that PBSP's concern would extend to such items; the fact that the prison has no label policy for such items indicates that the book label policy has no common sense relationship to PBSP's stated penological interests.

The Court, therefore, must conclude that there is no common sense relationship between the book label policy and PBSP's interests in preventing the introduction of contraband or ensuring prison safety.

CDC also contends that the presence of a book label allows for greater efficiency in the processing of inmate mail in that packages from a source other than an approved vendor can be immediately returned to the sender, rather than physically searched. Rodman Decl. at ¶ 6. However, Sgt. Rodman also states that packages not containing a vendor label or return address on the outside are opened in order to determine their origin. Rodman Decl. at ¶ 4. If the package is intended for a prisoner housed in PBSP's less secure areas, and the package contains an invoice or book label inside the package, PBSP mail room staff will most likely forward the package to the inmate. *Id.* However, if the package is addressed to an inmate in PBSP–SHU, and does not contain such information, the package will be rejected. *Id.* It thus appears that PBSP mail staff open and inspect all packages, regardless of whether a book label is attached to the outside of the package and regardless of the intended recipient's housing unit.

Moreover, while CDC states that only three persons are responsible for the "huge volume of mail property" flowing through PBSP–SHU, *see* Rodman Decl. at ¶ 6, there is no evidence of how much of that mail consists of book packages, the amount of time required to search each package, or, most importantly, whether the imposition of the book label policy has in fact assisted in improving the efficiency of PBSP's mail room procedures. It is difficult to infer any increase in efficiency given that with or without a book label, all packages shipped to PBSP must be searched. *See* Franck Decl., Exh. A; *see also Prison Legal News,* 238 F.3d at 1151 (rejecting argument that allowing subscription non-profit organization standard mail would decrease efficiency because "[t]he reality is that all incoming mail must be sorted").

Thus, the evidence submitted by Ashker and by CDC makes clear that the book label requirement is arbitrary and unreasonable and thus not rationally related to a legitimate penological objective. Summary judgment in favor of Ashker on his fourth cause of action is proper.

## II. Injunctive Relief

▆ Ashker seeks injunctive relief precluding PBSP's enforcement of the book label policy. CDC does not address this proposed relief. The Ninth Circuit has held that a party is entitled to a permanent injunction if it shows the likelihood of irreparable injury and the inadequacy of legal remedies. *See Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1495 (9th Cir.1996); *American–Arab Anti–Discrimination Comm. v. Reno,* 70 F.3d 1045, 1066–67 (9th Cir.1995). The standard for a permanent injunction is essentially the same as for a preliminary injunction except that actual success on the merits rather than likelihood of success on the merits must be shown. *See Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988).

▆ For the reasons discussed above, Ashker is entitled to summary judgment on his First Amendment claim and, therefore, has shown actual success on the merits. In order to demonstrate irreparable injury, a plaintiff must show a "real or immediate threat" that he or she "will be

wronged again;" in other words, "a likelihood of substantial and immediate irreparable injury." *Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). As a general rule, "a state law enforcement agency may be enjoined from committing constitutional violations where there is proof that officers within the agency have engaged in a persistent pattern of misconduct." *Thomas v. County of Los Angeles,* 978 F.2d 504, 508 (9th Cir.1992). The parties do not dispute that the book label policy has impeded and will continue to impede Ashker's First Amendment right to receive reading materials. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1148 (9th Cir.) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)), *amended by* 160 F.3d 541 (9th Cir.1998). Thus, Ashker has also shown irreparable harm and is entitled to injunctive relief.

The scope of injunctive relief must comply with the requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626 (PLRA). *See Gomez v. Vernon,* 255 F.3d 1118, 1128–1129 (9th Cir.2001). The PLRA requires that, prior to granting prospective relief, a court must find that the relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). Not only must these findings be made, but the court must also give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.; see also Gomez,* 255 F.3d at 1129.

The PLRA's limitations on injunctive relief reflect separation of powers and federalism concerns that have long informed the

Court's equitable powers with respect to State agencies. "When a government agency is involved, [courts must] observe the requirement that the government be granted the 'widest latitude in the dispatch of its own internal affairs.' " *Gomez,* 255 F.3d at 1129 (quoting *Rizzo v. Goode,* 423 U.S. 362, 378–79, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)); *see also Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[I]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."); *id.* (involvement of a State agency only increases the need for restraint given the introduction of federalism concerns) (citing *O'Shea v. Littleton,* 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). The PLRA thus "codifies existing law," *see Gomez,* 255 F.3d at 1129, requiring that any "injunctive relief ... avoid unnecessary disruption to the state agency's normal course of proceeding.' " *Lewis,* 518 U.S. at 349, 116 S.Ct. 2174 (quoting *Lyons,* 461 U.S. at 111, 103 S.Ct. 1660, and *O'Shea,* 414 U.S. at 501, 94 S.Ct. 669) (internal citations omitted).

In this case, the undisputed evidence shows that the violation of Ashker's First Amendment rights resulted from a policy applied to all prisoners at PBSP. The violation, therefore, is not "isolated," but rather results from a "policy ... that pervad[es] the whole system." *Armstrong v. Davis,* 275 F.3d 849, 870 (9th Cir.2001). In order to correct the violation, the Court must, at a minimum, enjoin the unconstitutional policy. Such an injunction is the "least intrusive means necessary" because a limited injunction directed only at the unconstitutional policy does not "require the continuous supervision of the court, nor do[es] it] require judicial interference in the running of the prison system." *Gomez,* 255 F.3d at 1130.

An injunction prohibiting CDC from requiring prisoners to include a book label pursuant to PBSP operational procedure, or from rejecting a book package because of the lack of a book label "is not overly intrusive and unworkable and would not require for its enforcement the continuous supervision by the federal court over the conduct of state officers." *Armstrong,* 275 F.3d at 872. Rather, such an injunction is narrowly tailored to redress the violation established by Ashker and is therefore authorized by the PLRA. 18 U.S.C. § 3626(a)(1); *Armstrong,* 275 F.3d at 870 ("The scope of injunctive relief is dictated by the extent of the violation established.") (quoting *Lewis,* 518 U.S. at 359, 116 S.Ct. 2174); *see also Crofton v. Roe,* 170 F.3d 957 (9th Cir.1999) (affirming district court's injunction which prohibited, on First Amendment grounds, the defendant prison from enforcing a blanket ban on the receipt of gift publications).

Other operational procedures requiring that book packages be shipped directly from the vendor to the prisoner with the vendor's return address and invoice, requiring the search of those packages, and limiting the type and number of books a prisoner may order and/or possess are not affected by this relief.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED (Docket No. 179). The Court will enter a permanent injunction by separate order. Because all of Plaintiff's claims have now been resolved either by summary judgment for Defendants, summary judgment for Plaintiff, or settlement, judgment shall now enter. Each party shall bear its own costs.

## PERMANENT INJUNCTION

For the reasons set forth in this Court's Order Granting Plaintiff's Motion for Summary Judgment,

IT IS HEREBY ORDERED AND ADJUDGED:

That Defendants as well as their officers, directors, employees, agents and those in privity with them are enjoined from enforcing any policy prohibiting Pelican Bay State Prison inmates from receiving books, periodicals, magazines or calendars solely because a book label approved by the prison was not attached.