**Cassandra BROWN, and Amy Courtney, Plaintiffs,**

v.

**CALIFORNIA DEPARTMENT OF TRANSPORTATION, Scotts Valley Police Department, Tom Bush, Jeff Morales, and DOES 1–10 Defendant.**

**No. C–01–21200 RMW.**

United States District Court, N.D. California. San Jose Division.

April 23, 2003.

Nathan C. Benjamin, Austin B. Comstock, Comstock Thompson Kontz & Brenner, Santa Cruz, CA, David Greene, James Wheaton, First Amendment Project, Oakland, CA, G. Dana Scruggs, Law Offices of G. Dana Scruggs, Santa Cruz, CA, for Amy Courtney, Cassandra Brown, plaintiffs.

Joseph R. Budesky, Robert J. Logan, Kisten M. Powell, Logan & Powell LLP, San Jose, CA, for Scotts Valley Police Department, Tom Bush, defendants.

Daniel P. Weingarten, California Department of Transportation, San Francisco, CA, Janet Wong, California Department of Transportation, San Francisco, CA, for California Department of Transportation, Jeff Morales, defendants.

## ORDER GRANTING PERMANENT INJUNCTION

WHYTE, District Judge.

On January 29, 2002, this court issued an order preliminarily enjoining defendants California Department of Transportation and CalTrans's Director Jeff Morales (collectively "CalTrans") from continuing CalTrans's practice of granting an exemption from its permit requirements for the display of American flags on highway overpasses but prohibiting or requiring permits for other flags or banners. *See* January 29, 2002 Order at 13. The injunction required CalTrans to enforce its permitting rules and regulations on a content neutral and viewpoint neutral basis. *Id.* CalTrans brought an appeal of this court's order before the Ninth Circuit, where argument was heard on October 9, 2002. Meanwhile, from November 18, 2002 to November 19, 2002, this court held a bench trial.

On March 13, 2003, the Ninth Circuit issued an opinion affirming this court's issuance of a preliminary injunction and remanding the matter for further proceedings. As this case has already been tried,

the court issues the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Based on the evidence presented to this court in connection with the November 2002 bench trial, the court makes the following findings of fact.

### A. *Stipulated Facts*

The following facts are established by stipulation of the parties.

1. When placed on a highway overpass, signs, banners, and United States flags each constitute an encroachment and are subject to removal by CalTrans.

2. Persons wishing to display signs, banners, and United States flags from state highway overpasses have never been issued an encroachment permit to do so.

3. A private individual's display of either the United States flag or a banner by attachment to a bridge structure is inconsistent with CalTrans policy.

### B. *Testimony of Amy Courtney* [1]

4. Ms. Courtney is a farm worker who lives in Santa Cruz County.

5. After the tragic events of September 11, 2001, plaintiff Amy Courtney witnessed the appearance of many United States flags hung from highway overpasses in the Bay Area. Courtney also witnessed banners hung from highway overpasses bearing messages including, "God Bless America," "Support Our Troops," and "United We Stand." Courtney perceived the flag as embodying a message of national unity and support for military action in the wake of the terrorist attacks—the "war" on terrorism. Courtney and co-plaintiff Cassandra Brown disagreed with the war on terrorism and decided to voice their disagreement with those who had hung flags and banners from highway overpasses.

6. On November 27, 2001, plaintiffs hung a banner from the fence on the Granite Creek Road overpass over state Highway 17 in Santa Cruz, California. Plaintiffs' banner faced northbound traffic and bore the message "At What Cost?".[2] Plaintiffs placed their banner next to a United States flag that also had been hung from the overpass fence. The flag was affixed to the outside of the overpass fence by plastic zip ties. Plaintiffs affixed their banner to the outside of the fence with twine. In addition to the flag, another banner containing the message "SC NY" was already hanging from the fence on the opposite side of the overpass.

7. Shortly after hanging their banner, plaintiffs witnessed a Scotts Valley police officer remove their banner from the overpass. The officer did not remove the flag or the "SC    NY" banner.

8. After calling the Scotts Valley Police Department and the California Highway Patrol to question the removal of her banner, Courtney telephoned CalTrans. During her call to CalTrans, Courtney spoke with an individual named Golizio, who identified himself as a spokesperson for CalTrans in the district which included Santa Cruz County.[3] Golizio informed

---

1. At trial, plaintiffs were also prepared to offer the testimony of co-plaintiff Cassandra Brown. The parties, however, stipulated that Ms. Brown's testimony was substantially identical to Ms. Courtney's and that Ms. Brown's expressive intent for hanging banners from Highway 17 overpasses on November 27, 2001 and December 4, 2001 was substantially the same as that of Ms. Courtney.

2. Plaintiffs also intended to hang another banner from the highway overpass at Mount Herman Road—south from Granite Creek Road— containing the message "Are You Buying this War?"

3. CalTrans District Five is the district encompassing Santa Cruz County. *See* ¶ 11 *supra*.

Courtney that post-September 11, Cal-Trans's informal policy was to allow United States flags to remain on overpasses while other materials would be removed. Golizio also informed plaintiff that if she wished to hang a banner from the overpass, she would need to file for a permit.

9. On December 4, 2001, plaintiffs again hung anti-war banners from highway overpasses in Santa Cruz County. The first banner, which stated "Are you Buying this War?", was hung on the Highway 17 overpass at Mt. Hermon Road. A second banner, bearing the words "At What Cost?", was hung from the Granite Creek Road overpass. The same United States flag remained hanging from the Granite Creek Road overpass. As on November 27, plaintiffs hung their second banner next to the flag. On this occasion, plaintiffs affixed their banners to the inside of the overpass fences using twine. The banners were tied to the fence in six points, three on each side of the banner.

10. The banners which plaintiffs hung on December 4 were ultimately removed, although there is no evidence to establish who removed the banners. CalTrans, however, has stipulated that it intended to remove—and would have removed—not only plaintiffs' banners, but also the banner reading "SC ♥ NY."

C. *Testimony of Steve Price*

11. Steve Price is currently employed by CalTrans in San Luis Obispo, California and holds the position of Deputy District Director for Maintenance and Traffic Operations, District Five. CalTrans District Five is comprised of five counties including Santa Cruz County. Price has been employed in various positions with CalTrans for over twenty years.

12. Within a CalTrans District, Maintenance and Traffic Operations constitute separate divisions. In District Five, Price serves as District Director for both divi-sions. The maintenance division is responsible for the care of highways, which includes such tasks as removing hazards and encroachments, repair, and landscaping. The traffic operations division is responsible for activities including issuance of encroachment permits, traffic safety, signing, and striping.

13. An encroachment is the occupation of, or placement of an object within, the state highway right of way by a third-party.

14. An encroachment permit is written authorization from CalTrans which allows a third party to place or construct something within the highway right of way.

15. Price also testified that prior to September 11, 2001, it was his personal practice and the practice of the department to allow United States flags to remain on highway overpasses but to remove other banners or signs. Price's personal practice, however, appears to be based on isolated incidents where he saw United States flags hanging from overpasses and did not cause them to be removed. Furthermore, Price did not appear to have a basis for testifying to the practices of others. Price stated only that he had observed United States flags hung from overpasses which had not been removed and that on an unspecified number of occasions, he had observed other banners or signs on overpasses which he later observed had been removed. Price's testimony is insufficient to establish the practice of other CalTrans officials with respect to the removal of United States flags hung from highway overpasses.

16. After September 11, 2001, Price witnessed a large proliferation of United States flags affixed to highway overpasses.

17. Price confirmed that the removal of plaintiffs' banners was consistent with CalTrans policy.

18. CalTrans communicates back and forth with law enforcement agencies.

## D. *Testimony of Shahram Sean Nozarri*

19. Shahram Sean Nozarri is currently employed by CalTrans as the Office Chief for CalTrans encroachment permits office in the Bay Area. Nozarri has held his current position since October 2000. Nozarri previously worked in the traffic systems department of CalTrans.

20. Nozarri is familiar with CalTrans permit policy regarding the placement of banners, flags and signs on state highway overpasses. Nozarri confirmed the parties' stipulation that prior to September 11, 2001, CalTrans would not issue any permits to persons who wished to display flags or banners on highway overpasses.

21. Shortly after September 11, Nozarri had a telephone conversation with personnel at the CalTrans Sacramento headquarters. The personnel with whom Nozarri spoke were responsible for overall permit policies state wide. Nozarri and his counterparts discussed the formation of an interim policy with respect to flags on highway overpasses. Among the persons Nozarri spoke with at CalTrans headquarters was Paul Cavanaugh. Nozarri spoke with Cavanaugh on September 13, 2001. After his discussion with Cavanaugh, Nozarri wrote and disseminated an e-mail message reflecting the information he had received from CalTrans headquarters. The email states:

To:       Permits Seniors
cc:        [various individuals]
Subject:   US FLAGS ON STATE HIGHWAYS

I just got word from HQ that the Department is formulating a temporary interim policy regarding U.S. flags on State highways in light of the recent tragedy in N.Y. and Washington. It would revolve along the following lines:

US Flags placed in State right-of-way will be allowed to remain in place for a temporary duration (while flags at fed/state buildings are flying at half-staff). Caltrans will not remove any flags but will ensure that they are placed safely and securely.
*Only* U.S. flags are allowed.
Permits will not be issued for such installations.

Please disseminate to appropriate field/office staff but stand by for more official information from HQ to follow.

Plaintiff's Ex. 1. Nozarri sent the email because he wanted staff to know that while no permits would be issued for flags, CalTrans' permit department would be tolerating United States flag installations. In other words, the permitting department adopted the information in the Nozarri email as a working policy. If CalTrans' departmental staff, including maintenance, encountered flags on highway overpasses, the departmental staff was to make sure the flags were securely in place and not flapping or otherwise posing a danger to the driving public.

22. The references in the Nozarri e-mail message tend to show that there was not a separate policy or practice between maintenance and permits. Instead, these references show that permits would not be required for the hanging of flags and that flags would not be removed.

23. The Nozarri email, coupled with plaintiff Courtney's telephone conversation with the CalTrans employee Golizio, establish that CalTrans had adopted a working policy to allow an individual's display of United States flags from highway overpasses without a permit while not allowing an individual's non-permitted display of any other sign, banner, or flag. It appears that the working policy remained in effect until the court issued its preliminary injunction on January 29, 2002. Essentially, CalTrans had granted an exemption to its permitting requirement where an individual sought to display a United States flag from a highway overpass.

## E. *Testimony of Paul Cavanaugh*

24. Paul Cavanaugh is currently employed in the Office of Traffic Operations in CalTrans's Sacramento, California headquarters and has worked with CalTrans since 1991. Within the Office of Traffic

Operations, Cavanaugh holds the position of Chief of the Encroachment Permit Branch. Cavanaugh's responsibilities include serving as a liaison between headquarters and the encroachment permitting departments of the twelve CalTrans districts.

25. Cavanaugh attended a meeting on September 13, 2001, with his supervisor and other superiors at CalTrans headquarters regarding CalTrans policy with respect to the hanging of United States flags on highway overpasses by members of the public. It appears that Cavanaugh and his colleagues decided that a working arrangement would be fashioned after the practices described in Sean Nozarri's September 13, 2001 email. After the September 13 meeting Cavanaugh communicated with Nozarri.

F. *Testimony of Gregory Lane Holtom*

26. Gregory Lane Holtom currently holds the position of associate right of way agent in the acquisitions branch of CalTrans's district office in Oakland, California. From September 2000 to September 2002, Holtom was an associate right of way agent in CalTrans's outdoor advertising branch. As part of his work with the outdoor advertising branch, Holtom was responsible for issuing permits and notices of violation with respect to outdoor advertising.

27. Holtom testified that outdoor advertising permits are not issued for the state right of way. Generally, permits are required for off-premises billboards that are visible from the main, traveled portion of the highway. Off-premises advertising refers to advertising for activities that occur outside or away from the actual, physical land on which the sign is located.

28. Holtom testified that an individual may be issued a permit for a sign structure adjacent to the state highway right-of-way and in full view of the highway.

The content of an individuals message is not a criteria for the issuance of such a permit.

29. Holtom testified that there is a $300 application fee when an individual applies for an outdoor, off-site advertising permit and a $20 yearly permit fee. Furthermore, an individual's application for an outdoor, off-site advertising permit may take up to 60 days to be processed.

G. *Testimony of Nevin Ouane Sams*

30. Nevin Quane Sams is currently employed with CalTrans as the traffic safety engineer for CalTrans District Five. Sams is the only person in District Five who holds this position. Sams oversees three divisions of employees: accident surveillance, safety project initiation, and a sign design squad.

31. Sams holds a bachelor of science degree in civil engineering from California Polytechnic University and has worked in traffic safety since 1987. As a part of his training in traffic safety, Sams received training with respect to human factors, and in particular, to human perception and reaction time. In preparation for his testimony, Sams reviewed four documents: the CalTrans Traffic Manual, the Traffic Engineering Handbook published by the Institute of Transportation Engineers, the Federal Highway Administration's Manual of Uniform Traffic Devices, and the California Vehicle Code. CalTrans designated Sams as an expert in traffic safety engineering.

32. Sams testified to various theories employed when deciding how signs are designed and where they are placed on the highway. Essentially, highway signing attempts to communicate to drivers in a clear and concise manner so to avoid confusion and lessen the time needed for interpretation. CalTrans often uses symbols instead of words to communicate mes-

sages. Messages using words should be short and legible.

33. Sams offered his opinion that as words are added to a sign, a driver's perception-reaction time increases. In Sams opinion, it takes less time to perceive and react to a United States flag than a banner because the flag does not include words, where a banner such as plaintiffs' would require reading.

34. The majority of the opinions in Sam's expert report with respect to the distraction of drivers applied equally to both flags and banners. Furthermore, Sams admitted that emotional factors related to the messages drivers receive also could affect a driver's perception and reaction time.

## II. CONCLUSIONS OF LAW

The court makes the following conclusions of law.

■ 1. A private individual's display, on a state highway overpass, of signs and banners conveying political messages is expressive activity within the meaning of the First Amendment.

■ 2. A private individual's display, on a state highway overpass, of the United States flag is expressive activity within the meaning of the First Amendment under the circumstances following the September 11, 2001 tragedy.

■ 3. In the wake of the September 11, 2001 terrorist attacks, this country's subsequent adoption of a "war" against terrorism, and the spontaneous proliferation of the display of the United States flag, the display of the United States flag constitutes expressive activity espousing support for this nation's unity in the effort to combat terrorism. *Brown v. California Dep't of Transp.*, 321 F.3d 1217, 1224 (9th Cir.2003).

■ 4. Plaintiffs' display of banners bearing the messages "Are you Buying this War?" and "At What Cost?" constituted expressive activity dissenting from the viewpoint espoused by display of the flag. *See id.*

5. Shortly after the September 11 terrorist attacks, CalTrans adopted a working policy which tolerated the display of United States flags from state highway overpasses by private individuals while not allowing or tolerating the display of signs, banners, or flags expressing other messages. The policy remained in effect until this court issued its preliminary injunction on January 29, 2002 and most likely would have continued in effect absent the injunction.

■ 6. A three part inquiry is conducted to determine the merit of plaintiffs' claim that CalTrans's policy constitutes unreasonable viewpoint discrimination in violation of their First Amendment rights.

First, we must classify the highway under the Supreme Court's forum analysis to determine whether the Government's interest in limiting the use of its property ... outweighs the interest of those wishing to use the property for other purposes. Second, we assess the appropriate level of scrutiny for that forum. Finally we must determine whether CalTrans's policy withstands this scrutiny.

*Brown*, 321 F.3d at 1221 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Children of the Rosary v. City of Phoenix,* 154 F.3d 972, 976 (9th Cir.1998)) (internal quotes and citations omitted).

■ 7. California state highway overpass fences are neither public fora nor limited public fora. *Brown*, 321 F.3d at 1222. Highway overpasses have not traditionally been available for public expression. *Id.* Further, CalTrans has not intentionally opened the state highway

overpasses for public discourse. Highway overpasses are not compatible with expressive activity because the unfettered display of messages on overpasses distracts drivers. Also, CalTrans's policy has been to prohibit all expressive signs, banners, and flags except for directional signs and, after September 11, 2001, United States flags. Thus, state highway overpasses are not limited public fora. *Id.*

■ 8. As the highway overpasses are nonpublic fora, CalTrans' restrictions on free expression on highway overpasses "are constitutional only if the distinctions drawn are (1) 'reasonable in light of the purpose served by the forum' and (2) 'viewpoint neutral.'" *Id.* (quoting *Cornelius*, 473 U.S. at 806, 105 S.Ct. 3439).

■ 9. CalTrans's policy of allowing the non-permitted display of United States flags from state highway overpasses while not allowing the display of other expressive flags, signs, or banners—whether containing words or otherwise—is not reasonable. *Id.* The purpose of the highway is for transportation, and the purpose of the highway overpass and its fence is for safe crossing over the highway by either cars or pedestrians. *Id.* CalTrans holds the responsibility to monitor the safety and maintenance of both. Although CalTrans justifies its policy of tolerating United States flags while not allowing banners on the ground that banners pose significant safety risks (in the form of driver distraction and falling objects), the same risks inhere to an individual's display of the United States flag from highway overpasses as well. Like persons hanging a banner, persons affixing a United States

flag to a highway overpass may inadvertently drop objects into the highway. A flag may become separated from its moorings and fall into the highway as easily as a banner. Moreover, since viewing the United States flag, particularly in times of war, could evoke extremely distracting thoughts—especially strong emotional reactions—the safety risk posed by distracted drivers is nearly equivalent between the display of the United States flag and banners containing words. *See id.* at 1223. Indeed, in many instances, the viewing the United States flag could evince a more distracting reaction than a banner bearing a message of varying lengths.[4]

■ 10. CalTrans's policy of allowing the non-permitted display of United States flags from state highway overpasses while not allowing the display of other expressive flags, signs, or banners is not viewpoint neutral. As discussed above, while the proliferated display of United States flags after September 11 was an expression of solidarity and support of our nation and its policies, plaintiffs' display of their banners was a means of expressing a dissenting viewpoint that questioned the country's commitment to military action.

11. As CalTrans's policy of allowing the non-permitted display of United States flags from state highway overpasses while not allowing the non-permitted display of other expressive flags, signs, or banners is neither reasonable nor viewpoint neutral, it is unconstitutional. *See id.* at 1222.

■ 12. Plaintiffs are entitled to permanent injunctive relief in the instant case. "The standard for a permanent injunction is essentially the same as for a preliminary injunction except that actual success on

---

**4.** Although CalTrans has offered Mr. Sams's opinion that it takes less time to perceive and react to a United States flag than a banner with words because the flag does not include words, Sams's opinion is of little value here. Sams has not conducted research to support

this conclusion. Sams and CalTrans have not studied the question of whether the United States flag is less distracting than all banners or signs. Further, Sams admitted that his opinion did not take into account emotional factors associated with the United States flag.

the merits rather than likelihood of success on the merits must be shown." *Ashker v. California Dep't of Corr.*, 224 F.Supp.2d 1253, 1262 (N.D.Cal.2002) (citing *Sierra Club v. Penfold*, 857 F.2d 1307, 1318 (9th Cir.1988)). Thus, "[a] party is entitled to a permanent injunction if it shows actual success on the merits and the likelihood of irreparable harm." *Clement v. California Dep't of Corr.*, 220 F.Supp.2d 1098, 1114–15 (N.D.Cal.2002) (citing *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1495 (9th Cir.1996)). For the reasons stated above, plaintiffs have demonstrated that the CalTrans working policy violates their right to free expression under the First Amendment. As "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1148 (9th Cir.1998) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)), plaintiffs are entitled to permanent injunctive relief.[5]

### III. ORDER

Defendant CalTrans is hereby permanently enjoined from continuing, adopting or implementing a policy or practice which allows an individual to hang a United States flag from a highway overpass without a permit while not allowing an individual to hang any other sign, banner, or flag from a highway overpass without a permit. CalTrans must enforce its permitting and maintenance rules and regulations on a content neutral and viewpoint neutral basis.

Nothing in this order shall preclude CalTrans from adopting any particular permitting or maintenance policy or practice with respect to the display of signs, flags, or banners on highway overpasses as long as those policies or practices are reasonable and viewpoint neutral.

### PERMANENT INJUNCTION

Defendants California Department of Transportation and Jeff Morales (collectively "CalTrans") are hereby permanently enjoined from continuing, adopting or implementing a policy or practice which allows an individual to hang a United States flag from a highway overpass without a permit while not allowing an individual to hang any other sign, banner, or flag from a highway overpass without a permit. CalTrans must enforce its permitting and maintenance rules and regulations on a content neutral and viewpoint neutral basis.

Nothing in this order shall preclude CalTrans from adopting any particular permitting or maintenance policy or practice with respect to the display of signs, flags, or banners on highway overpasses as long as those policies or practices are reasonable and viewpoint neutral.

---

**5.** CalTrans apparently sought to demonstrate that plaintiffs were not injured because they had an alternative means to voice their message in the form of billboard space along Highway 17. First, the record is less than clear as to whether plaintiffs would be required to obtain a outdoor advertising permit in order to display a political message in view of the state highway. Mr. Holtom's testimony at trial that no permit would be required is contradicted by his testimony to the contrary during his June 2002 deposition. Further,

even with the availability of advertising space, CalTrans working policy would still not be viewpoint neutral. "Imposing a financial burden on one viewpoint while permitting the expression of another free of charge runs afoul of the [viewpoint neutrality] requirement." *Brown*, 321 F.3d at 1225. Finally, as the delay involved in obtaining advertising space would inhibit plaintiffs' speech for even a minimal amount time, it "deals the same blow as does the permit requirement." *Id.*